Good morning, Mr. Woodbury. Nice to see you again. It's good to see you again, Judge Smith. It's nice to meet you, Judge Christin, and it's always a pleasure to appear before you, Judge Nelson. I'm appropriate. My name is Tom Woodbury and I am representing the appellants in this case, the Lions for Wild Rockies. And before we get too deep into questions, I hope that you will permit me to frame this matter for the court because I don't mind telling you, your honors, that this case is deeply troubling to me. This is not just the case of a failed proxy. This is a case of a failed forest plan. The whole point of forest planning is to prevent species from trending towards extirpation or extinction, or to prevent them from even being considered for listing under the Endangered Species Act. Counsel, I don't want to interrupt your initial start, except to ask this. Are you attacking the forest plan itself or the implementation of the forest plan in this particular appeal? With the exception of the big game standard, the implementation, the cumulative impact. When you said you got a failed forest plan, I thought, wait a minute, I didn't know you would appeal that. Right, the forest plan was fine as it was written, but under the Forest Service manual and the rules from the Forest Service, it's very clear that the point of forest planning and implementation is to balance uses, but to avoid extinction or extirpation, local extirpation. And yet here we find ourselves at the end of the first generation of forest plans, arguing over whether or not extirpation of a species from a national forest is a significant environmental impact. The Forest Service thinks there still might be one or two fishers left in the Colville National Forest, but they're not even willing to consider what it would take to allow those isolated survivors to recover, because according to the Forest Service, the forest plan doesn't say they have to, and the fisher isn't listed yet. But they're wrong about the forest plan, Your As a general matter, the forest plan says it has a response to issues. It's a little different the way this forest plan is written, but it starts out by saying how should the forest maintain wildlife and fish populations? And the response to the issue from the Forest Service is species dependent upon mature and old-growth forest habitats will diminish, but will be maintained at The forest-wide standards and guidelines for wildlife require the prevention of significant damage to forest wildlife and fish communities, and the key provision for purposes of the fisher is standard number seven, which says no actions that are likely to jeopardize the continued existence of any plant or animal species, or cause the need for listing any species under the authorized when evaluating the potential effects of an activity on any species, the species status, its dependency on the affected habitat, and the extent or limitation of the habitat will be evaluated as they influence the viability of populations within the forest or the range of the forest of the species. I think we get the thrust of your argument through your brief. I'd like to start by asking you an initial standing question, and that is that you've indicated that with respect to the A to Z project that the competitive bidding and so on was not appropriate, and the price at which bond brother lumbers could recoup cost was not was not appropriately disclosed. What standing does Alliance have to challenge that particular matter? How is it injured? Your Honor, after further discussion with attorneys handling this case in the lower court at the conclusion of briefing in this court, we would actually like the opportunity to recast and refine this argument with the saying that you're withdrawing the claim as briefed on this particular point. Yes, that's correct. All right, go ahead. The real issue we have with that contract is the wrapping the NEPA process into the contract, and we're wanting to recast the argument to focus on that rather than on the bidding. Did the other side agree that was okay? I mean, they weren't blindsided by it? I think it was . . . Got notice of your change of argument? No, actually, I just we just decided this last night. Okay, and what about the trial court? Did they come up there? We're working on developing a record in the trial. Okay, I guess my concern, as you well know, as a very experienced appellate advocate, you're asking us to basically put aside the argument you made in the brief. You're telling us that your new argument was not gone over with your opponents. They have no notice of it. The trial court didn't deal with it. Isn't the issue waived under the circumstances? This particular . . . For interlocutory purposes, yes. Well, that's what we're dealing with, isn't it? Interlocutory appeal, yeah. So for purposes of our argument, should we just dispose of that for the moment and indicate that that's not going to be successful because of the standing issue? No, we would like the opportunity to argue it with a full record. I'm losing you. Does that mean you want to . . . and you don't have a full record, so are you . . . what do you want us to do? To . . . for purposes of interlocutory appeal, we concede the issue on . . . not on Okay. You concede that the contract was okay or what? We have problems with the contract that we would like to pursue in summary judgment. So for purposes of this appeal, you concede the contract issue? Yes. Okay, got it. Thank you. So the decision for the . . . to summarize our argument, the remaining arguments, the decision not to prepare an environmental impact statement for the North Fork Mill Creek A-Z project is arbitrary and the Forest Service entirely failed to consider at least four important aspects of the problem. One, the failure of the Pine Martins Habitat Proxy to prevent the extirpation of the fissure from the Colville National Forest. Two, the related uncertainty created by the Forest Service's failure to monitor the effects of forest plan implementation on indicator species populations and Didn't the EA indicate that there were difficulties in monitoring the Pine Martin? No. That was the briefing. The Forest Service said that in their brief without any citation to the record, but there's . . . it's not hard to monitor Pine Martin because they were actually doing that for the first seven years of the forest plan and so we have a record of successful monitoring in the area of this forest of this sale. And also I think basically all that's required is to go out and look for tracks. That's the easiest way for both fissure and Martin. Maybe I misread the record. They had trouble finding that and therefore they had to use the proxy. Had trouble finding the Pine Martin? Yes. No, actually, yeah, they actually . . . there's no evidence of any Pine Martin populations in the project area. But that's not because they're difficult to monitor. It's because something happened back in . . . How could you monitor something you can't find? Well, the monitoring . . . the reason we don't have any evidence of the Pine Martin's local populations is because they have not . . . they stopped monitoring for Pine Martin back in 1995, I believe it was. Are you saying you have evidence that they are there? No, we don't have . . . they're not monitoring, so we don't . . . Counsel, with respect, following up on my colleague's point, if there aren't any there, then how can you monitor them? Are you saying they're not there because the forest plan was either defective or it was not properly implemented and something in the forest plan has killed them all? Is that what you're saying? It's not clear. What we presented to the court is the results of early monitoring in accordance with the forest plan of Pine Martin populations, and they found a declining . . . they found plenty of them there one year, they found them again the next year, and they didn't find any, and they never explained why, and they stopped monitoring. So the answer to that question, Your Honor, that's a question for the Forest Service, not for the planners. Let's just argument or say you're correct. What's the implication of that? Are you accusing them of going out and slaying them individually? What's the issue here? I mean, we used to have a lot more of various kinds of things that were . . . say the spotted owl, suddenly the does that mean that it's the forest plan's fault? Well, it's a significant issue that should . . . that they should actually take a hard look at. Perhaps so, but I guess my point is that, as you and I have discussed over the years, the reality is you've got your scientists, you've got the agency's scientists, and they look at the same things, and it's like looking at night and day. And as you know, under Land Council and other cases, unless in analyzing their science information and your science information, it's clear they simply have nothing to back up what they're saying, we defer to the agency. This is not a question . . . I think Dr. Johnson, who I'm sure is a very fine scientist, but her science disagrees with the science of the agency. Isn't that what we're really dealing with here? No, Your Honor. We're not. Not on this issue. That's not correct. There's no dispute. There's no dispute that the Pine Martin and its habitat are proxies for fisher viability, and there's no dispute that the fisher is no longer viable. The only dispute is whether the fisher's excavation attributable to the failed proxy. In other words, that they're still using Pine Martin habitat as a proxy for fisher. We don't know what the populations of Pine Martin are. We know that there's no fisher. And are you challenging the decision to use the Pine Martin habitat as a proxy? Is that part of your challenge? I'm sorry? Yes, it's a failed proxy, Your Honor. Okay, and so was that decision made as a part of the forest plan? When was that decision made? Yes, it was made as part of the forest plan. Okay. Can you tell me about what . . . it was adopted how many years . . . many years ago? Yes. All right. Is there . . . is there . . . can you just fill me in on why it wasn't challenged earlier? What is your response to the concern that it's too late to challenge that particular part of the forest plan? I'm sorry, what is the question? Why wasn't it challenged earlier? Right. I don't know. I'm not . . . I don't know what the answer to that question is. In other words, why wasn't it challenged as a proxy is the approach that's used in the forest plan. Right. You disagree with that, my colleague's saying, why wasn't that challenged some time ago? It's been around for years and years, right? Well, that's . . . I . . . you're asking me what the history of the forest . . . let me . . . all I can . . . all I can tell you is that we have this case, we have these facts, and I can argue the application of a lot of these facts, but the history of the forest plan . . . I don't . . . it's not . . . You said it was a failed forest plan, and we're just trying to understand how the habitat is proxy concept that my colleague brought up. If that's part of the forest plan, you say that's not good, and this is what's resulted, then what are you saying? The forest plan has to be changed? Let me . . . let me clarify this for you by reading the Forest Service's environmental impact statement supporting the forest plan. Just a little bit of this will address your questions. The forest plan provides for the maintenance of a diverse ecosystem across the forest by prescribing a complex interrelated management pattern of successional or old growth stages of forest dance. It also requires maintenance of unique limited communities and habitat components. Experience and management under this type of program is very limited, and there are concerns as to the effectiveness of scattered fragmented habitat units. Professional wildlife and habitat biologists did extensive review of literature and consulted with authorities on specific species, this is the EIS at the time of the forest plan adoption, prior to developing these management prescriptions so that assumptions used and direction provided are state-of-the-art. In order to ensure that the product of this plan is as desired, a monitoring plan has been developed in which both habitat quantity and quality and the response of wildlife populations will be tracked. As more is learned about any subject, additional questions will arise, therefore both the information needs and the items to monitor are expected to be updated as new needs are recognized, such as extinction from the monitoring before and after the responses of the management indicator species. Monitoring of management indicator species populations and their habitats will be necessary to assess whether they are responding as anticipated, and this And then there's also a description of the management indicator species themselves and how they were chosen, which, by the way, includes fish. I think we have your argument, time is up, do we have any questions? If I could, and I'm not, I'm really not trying to get in your way, but you started by saying, and I have read this briefing, I've spent quite a lot of time on this, so it's, I assure you, but you did start today by saying this is the case of a failed management plan, and then you said it was fine as written, but then there was a point at which there became a problem, and then I understood, I think, the rest of your argument, and then at the tail end here a minute ago, you talked about the fact that at the time the plan was adopted, it was a problem to adopt the, to make the decision to monitor the habitat of the pine martin as a proxy. So you really have said both things today about whether the design was wrong or whether the implementation was wrong, counsel, and so. We're not following it anymore, your honor. Okay, that's all I needed, counsel, but that's all I needed, and I'm not hostile to your cause, I'm trying to understand your argument. Yes. Thank you. I had a quick question. What language in the EA supports your argument that the forest plan requires population monitoring, not just habitat monitoring? That is in the, in the monitoring section of the forest plan, they are required to annually select a project or timber sale randomly for each district of the forest and to document the response of the management indicator species before and after the project, so it says that, let's see, I know this is in our brief, but basically that the quantity and the quality of the habitat and the response of, of local populations to selected sales would be monitored annually. So basically it's, you know, kind of a, taking a test case every year. That's what they were supposed to do. All right, thank you. Thank you, counsel, for your argument, we appreciate it. We'll now hear from Mr., is it Emmett, is that correct? Mr. Pershore. Oh, I'm sorry. There you go. I'm sorry. Good morning. Rudy Pershore with the United States U.S. Attorney's Office in Spokane, Washington. At the table is my colleague, Vanessa Waldroff, also an assistant U.S. attorney, and Mr. Lawson Feit is here representing the intervenors, and I just wanted the court to know of our 15 minutes, we've ceded five minutes to the intervenors so that they have some time. Keep an eye on the clock. These rarely work, but we can give it a try. They seem to be working fine today, Your Honor. Let me just start out with explaining the North Fork Mill Creek Project is a collaborative stewardship project that was the product of approximately almost 15 years of collaboration between environmentalists, the counties, individuals, timber company, to come up with an ecosystem restoration project that really benefits the environment by reducing environment, by reducing the risk of wild, catastrophic wildfire and insect and disease buildup through the thinning of the trees that are in this area. This particular area burned in 1926 and 1929, the entire drainage. And so these are trees that are about 80 to 90 years old. We're not talking about harvesting old trees. And these stands are overstocked and stagnant, and the thinning that's proposed here is really designed to reduce that insect, the potential for insect buildup and reduce the risk of catastrophic wildfire. Counsel, do you, I was impressed by the fact that the extensive outreach that took place in formulating this plan, among the environmental groups involved was Alliance for the Wild Rockies involved, do you know? I think they were probably contacted and they certainly provided input to the Forest Service. I don't believe they were part of the coalition itself. Okay. But bottom line is that this was environmental groups, generally speaking, were included in the group of people that helped formulate this plan. It wasn't done by, pardon the term, a lousy bureaucrat somewhere that just decided how it was going to do it. It was a community outreach, people were involved, they helped to plan it, they decided what to do, what not to do within the confines of the law as best they understood. Yes, Your Honor. It was a very collaborative approach on this particular project. And I think the important thing here is we're here on the preliminary injunction and as the district court found, the plaintiffs and the appellate did not meet their burden of showing all four elements that the Winters case requires in terms of whether a preliminary injunction should issue. And I think it's very clear that the district court did a very good job of conducting the I wanted just to address a couple of items that were brought up, Judge Nelson brought up what does the forest plan say about monitoring of Pine Marten. And in the record itself, the excerpts of record is a copy of the table that's in the forest plan. This is table 5.2 of the Colville forest plan, which outlines. You said ER. What page is in the ER? It's ER 3-277 at the very bottom. Thank you. And we're on a section on wildlife monitoring. And the particular section at the very near the very bottom of that page regards the monitoring of Pine Marten. And in the third column down, the units that are to be monitor are acres of suitable habitat in defined distribution, localized population or activity trends within specified areas. What this tells you is the Forest Service wasn't required to monitor populations per se. They could monitor the habitat, which is what they've done. I will tell you that what council represented is that the Forest Service did stop monitoring populations for a while, but they were not required to do that under this forest plan. And so when we talk about proxy on proxy analysis, it's inappropriate. This court has said several times that the proxy on proxy is a solid approach. And this particular, the Colville National Forest, this particular project really monitored the habitat that the Pine Marten need and indirectly the habitat that Fisher used because they're quite similar. But what about Tidwell? Do I misunderstand Tidwell? The proxy on proxy approach's reliability is questionable where the management indicator species is absent from the project area. I think it's pretty complicated, right? That is what Tidwell says, and we believe it's wrongly decided and kind of side with Judge Kaczynski and his dissent in that case. Okay, well, it's next argument because that's the law in the Ninth Circuit. So can you help me out with how that applies here, please? I can, Your Honor. We think the cases following Tidwell kind of changed the analysis. And one of those is Friends of the Wild Swan, which really talks about when the proxy on proxy approach is not valid. And you have to have these three things to say it's not valid. There's no data indicating the presence of the species, no suggestion there was difficulty monitoring, and third, there's a flaw in the Forest Service methodology that further undermined the habitat proxy approach. We don't think that those, all three of those conditions exist because the fact is the Forest Service went back in this case, and in 2012, they produced what's called the Yowkey Report. It's referenced in our briefing, where they took a very detailed look again. This is, let's see, 24 years after the Forest Plan was approved and said, what do these management indicator species need? And the Yowkey Report documented and confirmed that the species like pine marten need these very mature stands that have multiple stories, a lot of down woody debris, things like that. And then what we have is, if you follow Wild Swan through, there has been no allegation that the Forest Service methodology for collecting habitat data is flawed. The Forest Service has been collecting stand tree vegetation data almost since their inception at the early 1900s, and in this particular case, there's a detailed description in the silviculture report, and it makes its way into the EA of the stands that are there, the species breakdown, the age class breakdown that constitute the stands in this 12,000-acre project area. And what you'll notice is, after these devastating fires in the 20s, there's only 217 acres of stands that meet this, what the pine marten or the fisher prefer, which is these large or stands with large trees, multiple stories, lots of down woody material. They just aren't there because this burned 80, 90 years ago. And so we believe that the Forest Service actually did the best they could. They said, what's the next best habitat? Since we only have 217 acres of this very old, over-mature timber, what do we have? Well, we have this 80- to 90-year-old class that's generally now considered mature, and how much are we saving? The forest plan lays out the scheme for 160-acre patches distributed through the project area, and in this particular case, you can see in what I refer to as the math portion of our There was the calculation showing that this particular project left almost twice as much of that mature timber than what the forest plan required. And so when we look at the proxy on proxy habitat analysis, we don't think that Tidwell is necessarily the last word on that because Wild Swan, and I think there's another case, Inland Empire Public Lands versus Forest Service, the 1996 case, it also talks about that the habitat analysis is an appropriate substitute for population monitoring. And that's why we think what was said in Tidwell no longer applies because these two cases are indicating that habitat monitoring is appropriate. I will entertain some questions if you have further questions. I would like to know, if I could, I'm switching gears on you, but can you tell me what role does the 1992 monitoring report play in this case? Yes, Your Honor, and frankly, it did not, I think it's the 1993 one that plaintiffs complained about. Well, I might have a typo, I've got 92 in my notes, but I could have a typo. I know they raised the issue with a monitoring plan that indicated the Forest Service should consider a more holistic approach to elk habitat and cover, those kind of things. Right. How often are monitoring reports prepared? Well, they were being prepared annually, short reports annually, a bigger report every five years. The Colville Forest did stop for a period of about 15 years, and now they're starting again. I'm not sure if we're on a cycle yet where we have this. But this particular report, I think the important thing here is that the Forest Service wasn't required and didn't monitor or, excuse me, amend their forest plan because of this monitoring report. Is there, so could I, forgive me for interrupting, but is it possible that a monitoring report result can trigger the requirement to amend a forest plan? It certainly could, but we don't believe this is the case. In this particular case where the recommendation was you need to take a more holistic approach to wildlife cover, especially in big game, we believe this project does that. These ecosystem restoration projects are very different than the timber sale projects that the Forest Service was conducting in the 90s and certainly in the 80s. I read this particular recommendation, and again, I'm just kind of looking more sort of systemically, but you get this forest plan, and I think that we've clarified now that your opponent's position is that the forest plan was okay when it was adopted, and then sort of something happened along the way. The ball got dropped along the way, to use an unfair generalization. But anyway, so we have these monitoring plans, and if we're going to talk about the cover, that particular part of the report, it seems to me more what they were really saying is we had this objective, this ratio objective, and however many years in, we've taken a look and it wasn't, I think the word that they used is it wasn't really a realistic objective, given what we're starting with. Is that fair? I'm not sure that's a fair characterization for this particular project, and I'll tell you why. I think that's the word they used, but okay. The reason I think we think it doesn't apply in this project is, again, because the majority of this drainage is 80- to 9-year-old dense stands, and so the forest plan has an objective of having 50-50 cover to forage ratio, 50 percent of an area and cover 50 percent in openings to provide forage. This particular project area, because it's all these dense stands, is almost completely cover, and so the harvesting that's done in winter range here is providing some of that section of the forest towards that desired future condition that's designed in the forest plan. Okay. So your friend is now standing because he wants me to stop talking, but I'm just going to take one more question. So you get this, there was an objective originally in the plan of 50-50, then there's a monitoring report that says that's not realistic, or for some reason maybe we should change our mind about that, and nothing is done. So what happens to those monitor, where do those go? What happens? Well, part of it, they get incorporated back into the forest plan revision. Well, the forest plan is revised how often? How many years in between forest plans? They're currently revising the 88 plan now. So the objective was when the NFMA came out, every five to ten years. And it's happening, however, in two or three decades. Is that fair? Almost. Yeah. Okay. Thank you. Thank you. Good morning, counsel, and remember what I said, how hard it is to do the handoff, but you got three minutes and some change here, so. Thank you. Thank you, and thank you to government counsel for allowing intervenors to present oral argument. Loss and fight on behalf of the intervenors. I want to advise the court that the intervenors are a wide group of interests. They range from county governments to timber industry to environmental groups, and all of those groups are represented in the courtroom today. We have, in particular, we have Commissioner Karen Skoug from Ponderay County here, recognizing the importance of this project to all those varied interests. The collaborative that I represent, NUFIC for short, one of those pronounceable initialisms, it's been at work for 15 years trying to find ways to move forward in the Colville National Forest in a way that satisfies and meets the needs of the multiple stakeholders of this forest, which is really a big burden. Can I ask this question? Yes. My colleague has raised the point that you have the various reports. How often does the forest plan itself get changed? With the large constituency group you have there that helped formulate this, did anybody suggest that the forest plan needed to be amended as part of this process? As part of this project process, no, Your Honor. However, as government counsel indicated, the Colville forest plan is under a revision process. There has been a draft proposed plan outward, and the last report was that a final revised plan is scheduled to be released in October of this year. That plan would have no impact on this particular litigation? It would not, Your Honor. No one would be bound by it unless and until it was amended. As far as the plaintiffs and appellants' claims against the forest plan issue, they conceded that this failed proxy issue, as they call it, was apparent as early as 1995. So even if we say you don't have to bring a facial challenge, which you would have had to bring six years from 1988, your as-applied challenge, that accrued in 1995, and it should have been brought 16 years ago. As far as the project implementation, they haven't put anything in the record or raised any issues that would cast serious doubt on the Forest Service's analyses. The district court took all these issues under advisement and weighed them very carefully. This court's review on the equitable factors is, of course, abuse of discretion, and that's because of the closeness of the trial court to all the factors and all the evidence. Those factors all weigh in favor of the project here, particularly the fact that there is a mill in Pend Oreille County that's dependent on the supply from this project. Significant environmental group support and design has gone into the project to ensure that it's a restorative forestry project. So the environment is not going to be harmed by this project, but forestry goals will be accelerated by this project, and it supports that collaborative process. So this project is manifestly in the public interest. I thank the court, and I see my time has expired, but happy to entertain any questions. Thank you all for your argument. We appreciate it very much. Why don't you give it to us in a 28J letter? That way we'll have it in writing. Give it to us in a 28J letter. Okay. Thanks to all for their argument today. The case just argued is submitted, and the court stands in recess for the day.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: D.W. Nelson, M. Smith, Christen